Below is an opinion of the court.

_Teresa H. Pearson_
TERESA H. PEARSON
U.S. Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| In re<br><br>JASON HOWARD REED,<br><br>Debtor(s). | Case No. 22-30199-thp7 |
| SAMI HALES,<br><br>Plaintiff,<br><br>v.<br><br>JASON HOWARD REED,<br><br>Defendant. | Adv. Proc. No. 22-03037-thp<br><br>MEMORANDUM DECISION |

This adversary proceeding came before the court for trial on October 26, 2022. The court has considered the evidence presented, the arguments of the parties, the relevant legal authorities, and the records of this case. For the reasons set forth below, the court holds that Jason Howard Reed was the alter ego of ShinePro Building Solutions, LLC, that Mr. Reed is responsible for paying judgment against ShinePro and in favor of Sami Hales, and that Mr. Reed's obligation to pay that judgment is nondischargeable as arising from embezzlement under 11 U.S.C. § 523(a)(4).

Page 1 of 13 – MEMORANDUM DECISION

## Jurisdiction

This court has jurisdiction of this adversary proceeding under 28 U.S.C. § 1334, and authority to decide these claims as core proceedings under 28 U.S.C. § 157(b)(2)(I). The findings of fact and conclusions of law stated in this Memorandum Decision constitute the court's findings of fact and conclusions of law for purposes of Fed. R. Civ. P. 52(a), applicable in this adversary proceeding pursuant to Fed. R. Bankr. P. 7052.[1]

## Facts

At trial, both Mr. Hales and Mr. Reed testified and presented exhibits. Based on the evidence, the court makes the following findings of fact.

ShinePro was a single member limited liability company owned by Mr. Reed. ShinePro engaged in the businesses of residential remodeling and locksmithing. ShinePro maintained an office in Beaverton, Oregon, for that work.

Mr. Hales owned a house in Lake Oswego, Oregon, and wished to do significant interior remodeling. Mr. Hales' was working with a designer named Kiel Thode.

Mr. Thode shared the office with ShinePro, and recommended ShinePro as the contractor for the remodeling work. Mr. Hales, Mr. Reed, and Mr. Thode had discussions about the proposed project.

During those discussions, ShinePro requested that the full project cost be paid in advance. Mr. Hales was unwilling to pay the full amount up front. Mr. Reed said that he would need payment in advance to order materials for the project. Mr. Hales then agreed to pay $40,000, which was approximately half of the project's estimated total cost, as a deposit. Mr. Hales' understanding was that the deposit was to be held in trust and used only for payment for purchasing materials. Mr. Reed claims he did not have the same understanding—he said this was to be an ordinary deposit that was necessary to put the work on ShinePro's schedule, and that the deposit could be used for general purposes by his company.

---

[1] This disposition is specific to this case. It may be cited for whatever persuasive value it may have.

On January 6, 2021, which was sometime after those discussions, Mr. Hales, Mr. Reed, and Mr. Thode met to finalize the construction contract. The contract contained an interior remodeling estimate, a list of finishes, drawings and elevations, and general provisions. The contract contained only one provision relating to handling of the deposit:

> 3. If the owner wishes to cancel the project after paying the deposit but prior to the project start, this will result in a breach of contract and the contractor is not obligated to refund the deposit.

The contract did not specify for what purposes the deposit could be used. The contract was silent regarding what would happen to the deposit if the project was cancelled <u>after</u> the project started. The contract did not contain an integration clause.

Also on January 6, 2021, Mr. Hales paid the $40,000 deposit to ShinePro. Mr. Hales provided the $40,000 in cash to Mr. Reed, who then put the cash in ShinePro's safe. Although ShinePro maintained a bank account, Mr. Reed did not want to put the money into ShinePro's bank account because ShinePro had loan obligations to lenders EBF Holdings and MantisFund, and he was concerned that those creditors would auto-debit the funds out of ShinePro's bank account in payment of their loans. There is no credible evidence that any of the money ever went into ShinePro's bank account.

ShinePro and Mr. Reed commenced work on Mr. Hales' project. Mr. Reed spent time meeting with Mr. Hales, Mr. Thode, and vendors. Mr. Reed and ShinePro engaged in project planning and sourcing products. Mr. Reed spent time on site taking measurements, to be used in obtaining estimates for products. ShinePro proceeded to obtain quotes from NW Cabinet Source for materials. ShinePro obtained a quote dated January 11, 2021, for kitchen cabinets in the amount of $56,997.00, and a quote dated January 19, 2021, for countertops in the amount of $30,481.00.

Sometime during the week of January 19, 2021, one of ShinePro's employees tested positive for COVID, resulting in ShinePro's entire staff quarantining.

The following week, on Wednesday, January 27, 2021, Mr. Reed emailed Anastasia Yuskina, Mr. Hales' significant other. Mr. Reed stated that there had been changes to the project, that he received the quote for the cabinets and countertops on Monday, and that Mr. Hales and Ms. Yuskina could pick less expensive materials if the quotes were too high. He also mentioned that the project start date would be delayed from the second week of February to the first week of March due to the COVID outbreak and quarantine. Mr. Reed also mentioned the possibility of terminating the contract, stating the following:

> If this has become an inconvenience to you to the extent of wanting to terminate the existing contract, we can do that but I need to point out a few things first 1.) This will slow your project down further, and may become overwhelming for you to handle all on your own, 2. I've deposited your down payment into the company bank account and have already started purchasing products. If you wish to terminate the contract, I can refund what funds are currently available, and start processing the refund on the rest. (Returning products, canceling orders, etc.) This process will take 15-30 business days but can and will be done if that is what you wish.

On January 28, 2021, Mr. Hales and Ms. Yuskina responded to Mr. Reed, conveying that they decided to cancel their orders with "you and/or your company" and to request a "rapid refund" of the deposit. About half an hour later, Mr. Reed responded:

> Okay no problem. I will be sending a termination of contract agreement tomorrow, which I will need signed and returned in order to start the refund process of any funds. I will begin cancelling orders and trying to get the money back as soon as possible. Note- it may take up to 30 business days for the refund to fully process, and the 30 days begins when the signed termination agreement has been returned. Any and all fees associated with terminating the contract and cancelling orders will be deducted from the deposit payed. A print out of all charges will be included with your refund check.

On January 29, 2021, Mr. Reed emailed Ms. Yuskina that he was "beginning the process of terminating our contract and processing your refund." Mr. Reed signed and sent a form of termination agreement with the email. The termination agreement did not mention the amount to be refunded, but instead contained a full release, a statement that "no further consideration, compensation, or obligation will be due, payable or owing with regard to the

Contract as of the execution date of this Agreement," and an integration clause. While there is some dispute and confusion in the testimony over whether Mr. Hales modified the termination agreement and signed and returned the modified agreement to Mr. Reed, or whether Mr. Hales never signed and returned the termination agreement at all, it is clear the parties did not ever finalize a fully agreed and signed termination agreement.

Instead, Mr. Hales and Ms. Yuskina requested that Mr. Reed provide detail on what the outstanding obligations were, and how much the refund would be. In response, ShinePro prepared a "Project Termination & Refund" form, listing products, specific dates on which certain products were ordered, the cost of those products, and the cancellation/restocking fee for each of the products, and stating a total refund amount of $32,601.07. The form also contained the following language:

> Note: Product orders have been paused Pending cancellation. Once we Receive this form and the termination agreement, signed, I can begin cancelling the orders and having the individual vendors process the refunds back to my account. Given that there is five vendors with open orders for this project and I not having control over their timelines, it could take up to 45 days for ALL the vendors to fully process the refunds into my account. Once the funds have been refunded to my account, I can have my accountant issue a refund check.

In fact, this "Project Termination & Refund" form was entirely a sham. ShinePro had ordered no products, and there were no deposits with any of the vendors. Mr. Reed admitted that he made up the cancellation/restocking fees. At trial, Mr. Reed could not recall if he had started purchasing any product for Mr. Hales' project, and could produce no evidence in discovery that he ever had. At his Rule 2004 examination, Mr. Reed conceded under oath that he never ordered products for Mr. Hales' remodeling project. In response to an interrogatory, Mr. Reed could not identify any expenditures relating specifically to Mr. Hales' project, but instead indicated that business income was used for general operational expenses, including rent, office expenses, advertising, tools, and fuel.

Mr. Hales was apparently unsatisfied with this response because the parties did not agree on a refund amount of $32,601.07. Instead, on February 11, 2021, Mr. Reed emailed

Ms. Yuskina to say that he would waive the restock and cancellation fees, and refund the entire deposit, net of ShinePro's administrative fee of $1,500. Mr. Reed continued to imply that product had been purchased (when it had not been), and that he could not pay the refund until vendors refunded money to ShinePro:

> when you're ready for me to start the refund process please send me the signed forms that were sent to you yesterday. as a reminder it will take 30 days from receiving those documents because i can not refund money that has not yet even been refunded to me, i do still have to get refunded for all items purchased. it does not matter whether or not the products or materials have been delivered, they have been ordered and shipped and therefore there is cancellation and restock fees that come along with it. again i have agreed to waive the restock/cancellation fees, but i will be charging the $1500 for administrative labor.

Mr. Hales interpreted this to mean that he would receive a refund of $38,500 (the $40,000 deposit minus $1,500). Mr. Reed asserted that ShinePro was not legally obligated to make this refund, but that he wanted to do this for moral reasons and to be a "good person." In other words, although no formal written termination agreement was signed and agreed by both parties, there was an agreement between the parties that the amount to be refunded to Mr. Hales was $38,500.

On March 20, 2021, Mr. Reed emailed Ms. Yuskina to state that his company had gone bankrupt (although it had not) and to discourage Mr. Hales from pursuing a claim.

On May 7, 2021, Mr. Hales filed a complaint against ShinePro in state court for breach of contract, unjust enrichment, misrepresentation, and violation of the Unfair Trade Practices Act. On September 8, 2021, Mr. Hales obtained a default judgment on that complaint for $38,500, plus attorney fees, interest, and costs.

Ultimately, ShinePro closed. Many of ShinePro's records have been lost. ShinePro has never refunded any of the deposit, nor has it paid the judgment.

On February 9, 2022, Mr. Reed filed a bankruptcy case under Chapter 7. Mr. Reed's case has been fully administered and closed as a no-asset case.

On May 9, 2022, plaintiff timely filed his complaint for nondischargeability.

## Claims

Mr. Hales claims that Mr. Reed is an alter ego of ShinePro, that the corporate veil should be pierced, and that Mr. Reed is personally liable to pay the judgment Mr. Hales obtained against ShinePro. Mr. Hales also brings two claims for nondischargeability of that obligation under 11 U.S.C. § 523(a)(4): one for embezzlement and one for breach of fiduciary duty.[2]

### A. Claim for Alter Ego

"[U]nder some circumstances corporate shareholders who control and dominate a corporation may be held personally liable if the corporation is a mere 'instrumentality' or 'alter ego' and where fraud or injustice has resulted." *Amfac Foods, Inc. v. Int'l Sys. & Controls Corp.*, 294 Or. 94, 105, 654 P.2d 1092, 1099 (1982). "In order to succeed on a piercing the corporate veil theory of liability, the plaintiff must show that (1) the individual had actual control of the corporation; (2) the individual used their control of the corporation to engage in improper conduct; and (3) the plaintiff was harmed as a result of that improper conduct." *Greenleaf Auto Repair, LLC v. Ideal Auto Works, LLC*, 318 Or. App. 865, 867, 509 P.3d 750, 752 (2022) (*citing State ex rel. Neidig v. Superior Nat'l Ins. Co.*, 343 Or. 434, 454-55, 173 P.3d 123 (2007)). Here, plaintiff has shown all three elements are met.

First, Mr. Reed, as the sole member of ShinePro, had actual control over ShinePro.

Second, Mr. Reed used his control of ShinePro to engage in improper conduct. Under Oregon law, improper conduct includes inadequate capitalization, payment of excessive dividends, misrepresentation, and confusion or commingling of funds between the company and the owner. *Amfac*, 294 Or. at 109-110, 654 P.2d at 1102.

ShinePro was not adequately capitalized to take on the projects that it had. Although ShinePro took a $40,000 deposit from Mr. Hales in January 2021, ShinePro's bank

---

[2] Although "breach of fiduciary duty" is not a claim under 11 U.S.C. § 523(a)(4), the parties briefed and tried the case as a claim for fraud or defalcation while acting in a fiduciary capacity, and pursuant to Fed. R. Bankr. P. 1001, the court elects to treat this claim as such.

balance as of February 27, 2021, was only $1,733.04—even though ShinePro had ordered no materials for Mr. Hales' project. In the relevant time period, despite obtaining payment in full for another project for the Smiths (although that project was not completed), loan proceeds of $14,901 from Mantis Funding, and the $40,000 deposit from Mr. Hales, ShinePro had a negative bank balance as of March 22, 2021. ShinePro apparently did not have sufficient funds to return Mr. Hales' deposit, as ShinePro has never refunded that deposit.

Mr. Reed further engaged in improper conduct when he repeatedly told Mr. Hales and Ms. Yuskina that ShinePro had paid deposits to vendors for materials for their projects, when ShinePro had made no such deposits. Mr. Reed falsely stated that ShinePro needed to obtain a refund of the deposits from those vendors before it could refund money to Mr. Hales. Mr. Reed also falsely stated that ShinePro would need to pay restocking fees for canceled orders—orders that did not exist, and restocking fees that were entirely fictional.

There was also substantial confusion and commingling of funds between ShinePro and Mr. Reed. Many expenses of a personal nature were paid from ShinePro's account, including various streaming services (Netflix, Spotify, Hulu, Disney+), a purveyor of men's clothing (Threadbeast), and a dating app. While Mr. Reed asserts that he needed the streaming services to entertain customers in the waiting area of ShinePro's office and needed professional business clothes to meet with clients, the court does not find it credible that these were business expenses. In addition, business payments were deposited into Mr. Reed's personal bank account that should have been deposited to ShinePro's account. The first installment of the Paycheck Protection Program (PPP) loan for ShinePro, in the amount of $18,613, was deposited into Mr. Reed's bank account, as was a cashier's check made payable to ShinePro for $9,031.61. Mr. Reed could provide no accounting as to what happened to the $40,000 cash deposit made by Mr. Hales and placed into ShinePro's safe—or whether those funds were used by ShinePro or Mr. Reed.

Third, Mr. Hales was harmed as a result of Mr. Reed's conduct. Mr. Hales has not been able to recover any of the $38,500 that ShinePro agreed should be refunded to

Mr. Hales. Communications between Mr. Reed and Ms. Yuskina show that Mr. Hales was acting diligently and in good faith to reach agreement to terminate the contract and obtain return of his deposit. Mr. Reed's misrepresentations and sharp practices (including sending a form of termination agreement that excluded the possibility of a refund, while simultaneously telling Mr. Hales that ShinePro would provide a refund) were merely delaying tactics to stall any refund of the amount due to Mr. Hales. Those tactics worked. By the time that Mr. Hales obtained a judgment against ShinePro on September 8, 2021, ShinePro was unable to pay the debt. The parties agree that ShinePro has not refunded any of Mr. Hales' deposit.

The court recognizes that "piercing the corporate veil 'is an extraordinary remedy which exists as a last resort, where there is no other adequate and available remedy to repair plaintiff's injury,'" and that it should "examine whether plaintiff's legal claim provides an adequate remedy." *State ex rel Neidig*, 343 Or. at 445, 173 P.3d at 131 (citing *Amfac*, 294 Or. at 103, 654 P.2d at 1092 and *City of Salem v. H.S.B.*, 302 Or. 648, 655, 733 P.2d 890 (1987)). Here, Mr. Hales' legal claims against ShinePro have not provided, and will not provide, an adequate remedy—ShinePro is out of business and has no remaining assets from which Mr. Hales can collect.

**B.  Claim for Nondischargeability for Embezzlement.**

A debt for embezzlement is not dischargeable under 11 U.S.C. § 523(a)(4). Under federal law, embezzlement is defined as "the fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come." *Transamerica Com. Fin. Corp. v. Littleton (In re Littleton)*, 942 F.2d 551, 555 (9th Cir. 1991) (*citing Moore v. United States*, 160 U.S. 268, 269, 16 S. Ct. 294, 295 (1895)). To prove embezzlement, the plaintiff must prove three elements by a preponderance of the evidence:

(1)  property rightfully in the possession of a non-owner,

(2)  the non-owner's appropriation of the property to a use other than which it was entrusted, and

(3)  circumstances indicating fraud.

*Littleton*, 942 F.2d at 555 (elements of claim); *Grogan v. Garner*, 498 U.S. 279, 291, 111 S. Ct. 654, 661 (1991) (standard of proof). Here, plaintiff has shown all three elements are met.

First, the deposit was rightfully in the possession of Mr. Reed as a non-owner. It is true that, in most cases, a contractor receiving progress payments takes the funds as owner. *Fraternal Order of Eagles, Aerie 1490 v. Mercer (In re Mercer)*, 169 B.R. 694, 697 (Bankr. W.D. Wash. 1994); *Teamsters Loc. 553 v. Schultz (In re Schultz)*, 46 B.R. 880, 889-90 (Bankr. D. Nev. 1985); see also *First Delaware Life Ins. Co. v. Wada (In re Wada)*, 210 B.R. 572, 576 9th Cir. BAP 1997). However, as the bankruptcy court in *Mercer* recognized, this general rule applies only absent an agreement to the contrary between the parties. In *Wada*, the Bankruptcy Appellate Panel made clear that it is important to consider carefully the terms of the actual agreement between the parties to determine if a payment pursuant to a contract transfers ownership of the funds paid.

Here, the court finds there was an agreement to the contrary to the general rule—the $40,000 deposit was to be used for the purchase of materials for Mr. Hales' project. Mr. Reed did not dispute at trial that Mr. Hales agreed to pay the $40,000 deposit to ShinePro only after Mr. Reed asserted that he needed the deposit to order materials for Mr. Hales' project. Mr. Reed's later conduct also supports the existence of this agreement. Mr. Reed sent numerous emails to Mr. Hales and Ms. Yuskina indicating that he had used the deposit to order materials, even though he had not done so. This evidences Mr. Reed's understanding that the deposit was intended to be used for materials. Mr. Reed also bargained for the refund to be net of his administrative fees of $1,500.00. If the deposit had been for anything other than materials, he would not have needed to bargain for a reduction in the refund amount to cover his expenses.

To disclaim such a contrary agreement, Mr. Reed has pointed to section 3 of the contract, which stated that the deposit would be nonrefundable if the contract was terminated prior to the commencement of work. The court does not find this persuasive. In this case, the contract was terminated <u>after</u> the commencement of work, a situation that was not contemplated by the contract. It is undisputed that ShinePro had started work before the contract was

terminated by obtaining estimates and doing measurements. In addition, because the contract did not contain an integration clause, the prior agreement of Mr. Hales and Mr. Reed to use the deposit for materials for Mr. Hales' project was not superseded by the written contract, which was silent regarding how the deposit would be used.

Second, Mr. Reed used the deposit for a use other than that for which Mr. Hales provided it. Mr. Hales provided the deposit to ShinePro to purchase materials for his project. Although Mr. Reed could not account for what ShinePro did with the money, Mr. Reed did not actually purchase any materials for Mr. Hales' project.

Third, there are circumstances indicating fraud. When asked for a refund, ShinePro and Mr. Reed claimed that materials had been purchased and shipped, even though no orders had been made. ShinePro and Mr. Reed presented a "Project Termination & Refund" statement that detailed list of orders that were made, including order dates, bid dates, exact costs, and specific restocking fees—all of which was fictional. ShinePro and Mr. Reed intended Mr. Hales to rely upon these fictional orders as a basis for delaying the refund to Mr. Hales, and to preclude Mr. Hales from seeking an earlier remedy to obtain a return of the deposit. The Bankruptcy Appellate Panel has recognized that making false statements about whether deposits were made is sufficient to constitute fraud for purposes of determining nondischargeability. *Wada*, 210 B.R. at 577.

    **C.**    **Claim for Nondischargeability for Fraud or Defalcation in a Fiduciary Capacity.**

A debt for fraud or defalcation in a fiduciary capacity is not dischargeable under 11 U.S.C. § 523(a)(4).

Fraud for purposes of section 523(a)(4) means actual fraud. *Roussos v. Michaelidis (In re Roussos)*, 251 B.R. 86, 91-92 (9th Cir. BAP 2000), *aff'd*, 33 F. App'x 365 (9th Cir. 2002). Defalcation requires scienter—intentional or reckless misconduct—and not merely a failure to account. *Bullock v. BankChampaign, N.A.*, 569 U.S. 267, 273-75, 133 S. Ct. 1754, 1759-60 (2013).

Whether a debtor is a fiduciary under section 523(a)(4) is a question of federal law. A fiduciary relationship under this statute must arise from an express or technical trust that exists before the alleged defalcation. *Lewis v. Scott (In re Lewis)*, 97 F.3d 1182, 1185 (9th Cir. 1996). The very act of wrongdoing cannot create the trust, thereby eliminating constructive, implied, and resulting trusts from the reach of section 523(a)(4). *Id.; Ragsdale v. Haller*, 780 F.2d 794, 796 (9th Cir. 1986).

State law determines whether the express or technical trust relationship exists. *Ragsdale*, 780 F.2d at 796. "[T]he applicable state law must clearly define fiduciary duties and identify trust property." *Honkanen v. Hopper (In re Honkanen)*, 446 B.R. 373, 379 (9th Cir. BAP 2011). The requisite trust may be created by statute if it "bear[s] the hallmarks of an express trust." *Id*. Under Oregon law, a trust may be created orally, but the existence of an oral trust must be established by clear and convincing evidence. ORS 130.180.

Here, the court is not persuaded by clear and convincing evidence that a trust exists. While the evidence establishes that the parties intended ShinePro to use the deposit to purchase materials for Mr. Hales' project, there is insufficient evidence to establish that Mr. Hales' intended Mr. Reed to be a trustee, that Mr. Reed intended to owe the fiduciary obligations of a trustee to Mr. Hales, or that the deposit was trust property.

Because Mr. Hales has not established the required fiduciary relationship, the court need not determine whether Mr. Reed committed fraud or defalcation.

## Conclusion

For the reasons set forth above, the court will award judgment to plaintiff on his claims that (i) Jason Howard Reed was the alter ego of ShinePro Building Solutions, LLC, and (ii) the obligations of Mr. Reed to pay the judgment against ShinePro and in favor of Sami Hales are nondischargeable as arising from embezzlement under 11 U.S.C. § 523(a)(4). Plaintiff's claim for nondischargeability for a debt arising from fraud or defalcation in a fiduciary capacity under 11 U.S.C. § 523(a)(4) will be dismissed.

Plaintiff's counsel should prepare an appropriate form of judgment, which should be lodged within ten (10) days of entry of this opinion.

# # #

cc: Abraham J. Barnett
James G. DeRouin
Noah Bishop